IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCIS STOCK | : | |
| Plaintiff, | | |
| | | CIVIL ACTION |
| v. | : | NO. 16–6412 |
| | | |
| CHANELLE BRASWELL | | |
| Defendant. | : | |

**MEMORANDUM**

Jones, II  J.                                                                                           September 30, 2021

**I.      Introduction**

Plaintiff Francis Stock commenced the above-captioned action against Defendant Chanelle Braswell, alleging various violations of federal and state law regarding his arrest on December 16, 2014, at Community Education Center Oxford ("CEC Oxford"). Specifically, Plaintiff alleges a 42 U.S.C. § 1983 claim for false arrest and false imprisonment, averring that Defendant "stopped, detained and arrested Plaintiff at CEC Oxford for an alleged "hot urine," parole violation without any factual basis, justification, reasonable suspicion, or probable cause to do so." (ECF No. 17 ¶ 47.) He also alleges a Due process violation for "never [being] afforded the opportunity to confront the false allegations of a hot urine." (ECF No. 17 ¶ 47.) Finally, Plaintiff alleges corresponding state law claims for false arrest and false imprisonment. (ECF No. 17 ¶¶ 51–59.) Defendants have filed a Motion for Summary Judgment, which is now ripe for this Court's review. For the reasons set forth herein, Defendant's Motion shall be granted.

## II.     Statement of Relevant Facts

The undisputed facts[1] establish that Plaintiff Francis Stock was paroled from a State Correctional Institution to CEC Oxford in Philadelphia on or about December 8, 2014. (SUF ¶ 1.) Plaintiff agreed to the conditions governing his parole which included: 1) reporting to the parole board office; 2) retaining his approved residence at CEC Oxford in Philadelphia; 3) maintaining regular contact with the parole supervision staff; 4) Complying with criminal laws; and 5) abstaining from illegal drugs. (SUF ¶ 2.)

In addition, Stock agreed to special conditions, including obeying curfew restrictions as deemed appropriate by field supervision staff, submitting to random drug screening tests, and abiding by all rules, regulations and directives of CEC Oxford. (SUF ¶ 4.) The form Stock signed that laid out his conditions governing his parole required him to consult with parole supervision staff if problems arose and explained the Pennsylvania Board of Probation and Parole's ("PBPP") authority to lodge a detainer if Plaintiff was arrested on new criminal charges. (SUF ¶ 5.) This form notified Stock that if he violated a parole condition, an appropriate hearing would be held, after which the PBPP could decide he was in violation of a parole condition and recommit him to prison for such time as the PBPP may specify. (SUF ¶ 5.) The conditions also required Stock to expressly consent to the search of his person, property, and residence, without

---

[1] Plaintiff's response to Defendant's Motion for Summary Judgment is not compliant with this Court's Policies and Procedures regarding motions for summary judgment, as provided on the EDPA website. Specifically, Plaintiff's Response does not contain "a recitation of facts with complete and accurate citation to the record." See "*Judge C. Darnell Jones II Chambers Policies and Procedures*," Civil Cases, §D(4)-(5); see also FED. R. CIV. P. 56. However, inasmuch as Mr. Stock is a *pro se* litigant, leniency must be applied with regard to technical deficiencies. Nevertheless, any assertions that were not supported by the record have been rejected as unsupported and conclusory.

2

a warrant by PBPP agents and informed him that any items in his possession which constituted a violation of parole would be subject to seizure. (SUF ¶ 5.)

On or about December 9, 2014, [2] Plaintiff met with Defendant Braswell, reviewed all conditions and special conditions of parole with her, and signed the appropriate documents. (SUF ¶¶ 1, 6, 7.) Plaintiff also received a CEC Oxford handbook upon arrival, informing him of Oxford's rules. (SUF ¶ 9.) Stock read the handbook and was required to abide by those rules (SUF ¶ 9.)

Before arriving at CEC Oxford, Stock arranged to work for his brother-in-law during the day in Upland, Pennsylvania. (SUF ¶ 10.) CEC Oxford granted him employment passes to do so. (SUF ¶ 10.) He started work the same week he arrived at CEC Oxford. (SUF ¶ 10.) CEC Oxford recorded the passes electronically with beginning and end times on the same day. (SUF ¶ 12.) The employment pass was for twelve or fourteen hours, and included time for Stock's commute, which was anywhere from one to two-and-a-half hours each way. (SUF ¶ 12.) Upon Stock's return at the specified time each day, a CEC Oxford employee would unlock the door and observe him passing through a metal detector. (SUF ¶ 13.)

Stock claims that on Monday, December 15, 2014, he left for work in the morning with an employment pass, returned on time after twelve or fourteen hours, and had no trouble leaving again the morning of December 16, 2014. (SUF ¶ 14.) However, at 11:48 p.m., on Monday, December 15, 2014, an Oxford agent—Charles Owens—reported that Stock failed to return by his required curfew time. (SUF ¶ 15.) At 12:08 a.m. on December 16, 2014, PBPP Operation

---

[2] While there is a discrepancy in the record as to what day Plaintiff first met with Agent Braswell—Plaintiff testifying at his deposition it was December 8, 2014 (Stock Dep. 11:10–11.) and the Supervision history (Stock 009) indicating it was December 9, 2014— this is not a material fact and is not relative to the outcome of this case.

Center Monitor, Courtney Douden, emailed Owens' information of Stock's failure to multiple recipients, including Parole Agent Braswell. (SUF ¶ 16.) Douden's email relayed that Stock had been entered into the NCIC (the FBI's National Crime Information Center) database. (SUF ¶ 16.) On December 16, 2014, based on the information she received in the aforementioned email, Agent Braswell submitted a wanted notice request for Stock, in which she averred that her last contact with Stock was on December 9, 2014. (SUF ¶ 17.) The warrant notice also stated that on December 16, 2014, Agent Braswell had been informed that Stock had moved from his approved residence. (SUF ¶ 17.) Accordingly, Agent Braswell recommended Stock be declared delinquent, effective December 15, 2014. (SUF ¶ 17.)

On December 16, 2014, the PBPP issued a warrant to detain and commit Stock. (SUF ¶ 19.) On the night of December 16, 2014, Stock returned to CEC Oxford and Agent Braswell was present. (SUF ¶ 20.) As he went through the metal detector, his camera phone triggered an alarm. (SUF ¶ 20.) A CEC Oxford employee at the desk searched Stock, who cooperated by pulling his phone and money from his pockets. (SUF ¶ 20.) At that time, Agent Braswell detained Plaintiff.[3] (SUF ¶ 21.) Stock claims that Braswell told him his camera phone was not allowed, observed that he had over $300 in cash, and asked if he had taken illegal drugs. (SUF ¶ 21.) Plaintiff denied taking illegal drugs. (Stock Dep. 29:4–6.) Upon authorization from her supervisor, Agent Braswell awaited the arrival of another agent and then transported Stock to Kintock Parole Violator Community Corrections Center ("Kintock") to await a technical parole violation

---

[3] In his Response, Plaintiff avers he "handed his phone to the staff member at the desk after going through the metal detector, as required, and therefore did not break any rules." (PRSJ ¶¶ 3–4.) However, this assertion is not supported by the record. (Stock Dep. 28:11–29:2.) Accordingly, there is no genuine dispute as to whether Plaintiff was allowed to have a camera phone or not.

hearing. (SUF ¶ 23.) Agent Braswell detained Stock for about an hour, including his 9:33 p.m. transport to Kintock. (SUF ¶ 23.)

At Kintock, Stock was placed on the parole violation side of the facility and was allowed to keep the money he had earned from working that had been previously seized. (SUF ¶ 24.) Other inmates learned that Stock had around $300 on him and eventually jumped him for the money. (Stock Dep. 17:11–22.) On the morning of December 20, 2014, less than four full days after arriving at Kintock, Plaintiff was escorted to Episcopal Hospital, presenting with chest pain and anxiety. (SUF ¶ 26; Stock 059.) Stock absconded from Episcopal before receiving treatment and did not return to Kintock. (SUF ¶ 26.)

On January 5, 2015, Stock was arrested on assault charges and detained at the Delaware County prison until the assault charges were ultimately dismissed on February 11, 2015. (SUF ¶ 27.) After dismissal of the assault charges, Stock was transferred to Coleman Hall Halfway Back, where he was arrested on February 26, 2015 by Philadelphia Police on an escape charge and two technical parole violations related to his absconding from Episcopal hospital on December 20, 2014. (SUF ¶ 28; Stock Dep. 43:9–21; Stock 016, 035.) Kintock was the complaining witness who filed the escape charge. (SUF ¶ 28.) Bail was set on the escape charge, and Plaintiff was transferred to State Correctional Institute ("SCI") Graterford. (*See* SUF ¶ 29; Stock Dep. 43:18–44:6.)

Agent Braswell met with Stock at SCI Graterford on March 25, 2015, where she presented him with the technical parole violations that had been charged as a result of his absconding from Episcopal Hospital.[4] (SUF ¶ 30.) Plaintiff waived his rights to a hearing

---

[4] Plaintiff states that at this March 25, 2015 meeting with Agent Braswell, she presented him with two violation sheets—one for the absconding from Episcopal Hospital, and one for an alleged 'hot urine.' However, after Plaintiff reminded Agent Braswell that his urine was clean in

5

regarding the technical parole violations related to Episcopal Hospital. (SUF ¶ 32.) At a preliminary hearing on April 1, 2015, Plaintiff's escape charge was held for court. (SUF ¶ 36.) On April 28, 2015, the PBPP recommitted Stock for six months as a technical parole violator for absconding from PVCCC Kintock. (SUF ¶ 37.) The escape charge was *nolle prossed* on December 14, 2015 and Stock was re-paroled later that month. (SUF ¶¶ 38, 39.)

Agent Braswell never charged Plaintiff with a technical violation hearing regarding the events of December 16, 2014. (SUF ¶ 38.) This was because Agent Braswell had not yet arranged for the technical violation hearing before Stock absconded from Kintock on December 20, 2014. (SUF ¶ 33.) When Stock was charged with absconding from Kintock on December 20, 2014, Agent Braswell choose not to violate him for December 16, 2014, believing that stacking the charges would not have affected the likely sanction of six months. (SUF ¶ 33.)

### III.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1)

---

December 2014, she discarded the hot urine violation sheet and they proceeded on the violations relating to Episcopal Hospital. (Stock Dep. 46:18–47:7.)

material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**IV.    Discussion**

    **A.    Count I: 42 U.S.C. § 1983**

Plaintiff's First Count contains Fourth and Fourteenth Amendment claims brought under 42 U.S.C. § 1983. In said Count, he asserts that when Agent Braswell "stopped, detained and arrested Plaintiff at CEC Oxford for an alleged 'hot urine' parole violation without any factual basis justification, reasonable suspicion, or probable cause to do so," she falsely arrested and falsely imprisoned him, in violation of his Fourth and Fourteenth Amendment rights, respectively. (SAC ¶ 47.) Plaintiff also asserts a due process violation for "never [being] afforded

the opportunity to confront the false allegations of a hot urine." (SAC ¶ 47.)   For the reasons that follow, this Court finds summary judgment to be appropriate as to Count I.

### i.        False Arrest/False Imprisonment Claims

A § 1983 claim for false arrest or illegal seizure under the Fourth Amendment requires a showing that the arresting officer lacked probable cause at the time of the seizure. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995). Furthermore, "where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *O'Connor v. City of Philadelphia*, 233 F. App'x 161, 164 (3d Cir. 2007) (citing *Groman*, 47 F.3d at 636). "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).

However, "[t]he proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but *whether the arresting officers had probable cause to believe the person arrested had committed the offense.*" *Johnson v. Bingnear*, 441 F. App'x 848, 851 (3d Cir. 2011) (quoting *Groman*, 47 F.3d at 634) (emphasis added). While probable cause is typically a factual issue, "where no genuine issue as to any material fact exists and where credibility conflicts are absent, summary judgment may be appropriate." *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984).

When detaining a parolee, the requisite level of suspicion to effectuate an arrest lowers from probable cause to reasonable suspicion. *United States v. Henry*, Cr. No. 06-33-01, 2008 U.S. Dist. LEXIS 54612, at *16 (E.D. Pa. 2008) (citing *United States v. Miller*, 267 F. App'x

152, 154 (3d Cir. 2008) (detention of parolee did not violate Fourth Amendment where officer had reasonable suspicion to detain him). Thus, the question here is whether Agent Braswell had reasonable suspicion to arrest Plaintiff on December 16, 2014. Based on the record, it is clear Agent Braswell had *at least* reasonable suspicion, if not probable cause, to detain Plaintiff on the day in question.

The record clearly establishes that on December 15, 2014 at 11:48 p.m., an Oxford agent—Charles Owens—reported that Plaintiff failed to return to CEC Oxford by his curfew time. (SUF ¶ 15.) This information was conveyed to Agent Braswell via email from PBPP Operation Center Monitor Courtney Douden a few minutes later, on December 16, 2014.at 12:08 a.m. (SUF ¶ 16.) Braswell was also informed in that email that Plaintiff had been entered into the NCIC (the FBI's National Crime Information Center) database. (SUF ¶ 16.) Relying on this information, when Plaintiff arrived at CEC Oxford on the night of December 16, 2014, Agent Braswell had *at least* reasonable suspicion, if not probable cause, to believe Plaintiff violated the terms of his probation on December 15, 2021.

However, upon arrival at CEC Oxford on December 16, 2014, Plaintiff walked through the metal detector and triggered the alarm due to a camera phone on his persons. (SUF ¶ 20.) Plaintiff was not allowed to have a camera phone at that time. (Stock Dep. 28:11–17.) Plaintiff was patted down by another employee at CEC Oxford, at which time he pulled the camera phone out of his pocket. (SUF ¶ 20.) Agent Braswell witnessed this and intervened once she saw the camera phone. (SUF ¶ 21; Stock Dep. 31:22–32:7.) Despite being a minor and extremely technical violation, this event gave Agent Braswell probable cause to detain Plaintiff at that time.

The undisputed facts establish that Agent Braswell had *at least* reasonable suspicion to detain Plaintiff on December 16, 2014 for his alleged curfew violation, and probable cause to

9

detain Plaintiff for having a camera phone on December 16, 2014. There are no credibility conflicts regarding the email Agent Braswell received or that she witnessed the camera phone infringement.[5] Accordingly, summary judgment is appropriate and shall be granted as to Plaintiff's § 1983 claims for false arrest and false imprisonment.

### ii.     *Due Process Claim*

Plaintiff's Second Amended Complaint pleads a due process violation resulting from "never [being] afforded the opportunity to confront the false allegations of a hot urine." (SAC ¶ 47.) The record is devoid of any evidence to establish that a hot urine allegation was officially lodged against Plaintiff. (Stock Dep. 46:18–47:7.)

In his response to Defendant's Motion for Summary Judgment, Plaintiff attempts to amend this claim to the broader assertion that his rights were violated, not by *being denied a hearing on the hot urine*, but by *not being served a notice of hearing and charges for the parole violations* resulting from December 16, 2014. (Pl.'s Opp'n Summ. J. ¶ 9.) Amendment of a Complaint is governed by Federal Rule of Civil Procedure 15. Said Rule does not provide for amendment of pleadings via briefing in response to summary judgment. However, assuming *arguendo* that Plaintiff's SAC included the broader claim stated above, summary judgment would still be warranted because Plaintiff was not deprived of a liberty interest as a result of the December 16, 2014 allegations.

"The Due Process Clause protects against the extended detention of a criminal defendant without a hearing before a judicial officer to contest the validity of the detention." *Tarapchak v.*

---

[5] Plaintiff seems to express incredulity at the discovery of the aforementioned email and documents relating to his missed curfew on December 15, 2014. (Stock Dep. 58:16–24.) However, an incredulous reaction to the discovery of damaging evidence is not the same as a genuine dispute of material fact or an issue of credibility. Accordingly, Plaintiff raises no genuine dispute of material fact with regard to these documents.

*City of Lackawanna*, 739 F. App'x 172, 176 (3d Cir. 2018). "[T]he lawfulness of 'detention . . . will[,] after the lapse of a certain amount of time[,] deprive the accused of liberty without due process of law.'" *Id.* at 177 (quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979)). However, as this Court has already iterated: "[a]bsent a state law to the contrary, the Fourteenth Amendment does not create a due process right for prisoners subject to transfer." *Stock v. Braswell*, Civ. No. 16–6412, 2017 U.S. Dist. Lexis 121325, at *13 n. 9 (E.D. Pa. Aug. 2, 2017) (ECF 8) (citing *Meachum v. Fano*, 427 U.S. 215, 216 (1976); *Sandin v. Conner*, 515 U.S. 472, 474 (1995)). This is because the prisoner's "conviction has sufficiently extinguished [his] liberty interest to empower the State to confine him in any of its prisons." *Id.* (quoting *Olim v. Wakinekona*, 461 U.S. 238, 244–245 (1983)).

      Here, Plaintiff was arrested on December 16, 2014 and moved to Kintock until December 20, 2014, when he absconded. (SUF ¶¶ 21, 23, 26.) He was then arrested on new criminal charges on January 6, 2015, which were dismissed on February 11, 2016. (SUF ¶ 27.) On February 26, 2015, Plaintiff was arrested on a charge of criminal escape and two technical parole violations relating to his absconding from Kintock on December 20, 2014. (SUF ¶ 28.) On March 25, 2015, Plaintiff met with Agent Braswell, who decided to only pursue technical parole violations relating to Plaintiff's December 20, 2014 absconding charge. (SUF ¶¶ 30, 33.) Plaintiff agreed to waive his right to a hearing. (SUF ¶ 32.) On April 28, 2015, the PBPP recommitted Plaintiff for six months on the technical parole violations from December 20, 2014. (SUF ¶ 37.) Upon serving these six months and his escape charge being *nolle prossed*, Plaintiff was re-paroled in late December 2015. (SUF ¶¶ 38, 39.)

      Plaintiff's due process claim fails because he was never deprived of a liberty interest as a result of not having a hearing on the December 16, 2014 alleged technical parole violations. As

11

previously discussed, Plaintiff did not have a liberty interest in staying at CEC Oxford. *Stock v. Braswell*, Civ. No. 16–6412, 2017 U.S. Dist. Lexis 121325, at *13 n. 9 (E.D. Pa. Aug. 2, 2017); *see also Sandin v. Conner*, 515 U.S. 472, 474 (1995); *Olim v. Wakinekona*, 461 U.S. 238, 244–245 (1983); *Meachum v. Fano*, 427 U.S. 215, 216 (1976). Therefore, when Agent Braswell transferred him to Kintock, it cannot be said that Plaintiff was deprived of a liberty interest without due process of law.

With respect to Plaintiff's detention from January 5, 2015 until early February 2015, that detention was the result of a new assault charge. (SUF ¶ 27.) Agent Braswell had no involvement with this and cannot be said to have deprived Plaintiff of his liberty interest at that time. In February, Plaintiff was arrested at Coleman Hall Halfway Back and transferred to SCI Graterford for his escape charge. (SUF ¶ 28; Stock Dep. 43:9–44:6; Stock 016, 035.) Agent Braswell was once again not involved with this arrest. On March 25, 2015, Agent Braswell met with Plaintiff to discuss his alleged parole violations regarding his absconding on December 20, 2014. (SUF ¶ 30.) Plaintiff agreed to waive his right to a hearing on those technical parole violations and was recommitted for six months.[6] (SUF ¶ 32.) From that time until his re-parole, Plaintiff was either detained because of the six-month recommitment or because of a pre-trial detention on his escape charge.

Accordingly, Plaintiff was never deprived of a liberty interest *solely* on the basis of the December 16, 2014 allegations—from December 16, 2014 through December 20, 2014, Plaintiff did not have a liberty interest to remain at CEC Oxford in the first place, and from January 2015

---

[6] Plaintiff argues this waiver was involuntary because Agent Braswell threatened him. (Pl.'s Opp'n Mot. Summ. J. ¶ 29.) However, this assertion is not buttressed by the record and is therefore deemed an unsupported fact. Accordingly, no reasonable jury could find his waiver involuntary.

to his re-parole in December 2015, Plaintiff was properly being held as either a pre-trial detainee relating to his escape charge, or based on his admitted parole violations for absconding on December 20, 2014. Accordingly, no reasonable jury could conclude that Plaintiff's due process rights were violated, and Defendant is entitled to Summary Judgment on this claim.

### B. Counts II and III: Unlawful Arrest/False Arrest and False Imprisonment Claim

Counts II and III of Plaintiff's Amended Complaint are state law claims for false arrest and false imprisonment, respectively. Plaintiff avers that on December 16, 2014, "[Agent Braswell] unlawfully arrested plaintiff and took him into custody without just and legal cause, without knowledge that the plaintiff violated his parole, and without probable cause." (SAC ¶ 52.) Plaintiff further claims the arrest on December 16, 2014 "was willful[,] malicious, without just and legal cause, without knowledge that the Plaintiff violated his parole, without probable cause, and without provocation, [and] caused all the injuries and damages described above, including but not limited to, deprivation of liberty, extreme emotional distress, mental anguish, humiliation, and embarrassment." (SAC ¶ 54.) Count III alleges a state law claim for false imprisonment, in which Plaintiff contends "Defendant unlawfully, forcibly, and maliciously imprisoned, restrained and deprived Plaintiff of his liberty against his will, without legal authority to do so." (SAC ¶ 56.)

For the reasons stated above,[7] these claims fail on the merits and summary judgment is granted on Counts II and III.

---

[7] *See supra* Section IV.A.i.

### C. Qualified Immunity

Assuming, *arguendo*, that Plaintiff's § 1983 claim is meritorious, it also fails on the grounds that Agent Braswell is entitled to qualified immunity. Qualified immunity establishes that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity is an objective question to be decided by the court as a matter of law. The jury, however, determines disputed historical facts material to the qualified immunity question." *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) (internal citations omitted).

> The qualified immunity defense involves a two-step analysis:
>
> > First, a court must determine whether, taking the facts in the light most favorable to the plaintiff, the defendant official's conduct violated a constitutional right at all. If it did, the court must then determine whether that right was clearly established at the time of the alleged violation, given the specific facts of the case.

*Johnson v. Anhorn*, 416 F. Supp. 2d 338, 361 (E.D. Pa. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001)) (internal citations omitted).

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Even if the official is mistaken, he or she may be shielded from liability nonetheless if he or she made a 'reasonable mistake as to what the law requires.'" *Johnson*, 416 F. Supp. 2d at 361 (quoting *Carswell*, 381 F.3d at 242).

Taking the facts in the light most favorable to the plaintiff, Stock has failed to meet the first step of overcoming a qualified immunity defense—establishing a constitutional violation.[8] Agent Braswell had sufficient suspicion to arrest the Plaintiff on December 16, 2014.[9] Accordingly, Defendant Braswell is entitled to qualified immunity for Plaintiff's First Cause of Action.

### D.     Sovereign Immunity

Even assuming, *arguendo*, that Plaintiff's state law claims for false arrest and false imprisonment were meritorious, they also fail on the grounds of sovereign immunity. Just as she did in her first, second, and third motions to dismiss, Defendant Braswell asserts that because she was acting within the scope of her employment, she is entitled to sovereign immunity, in accordance with 1 Pa. C.S. § 2310.[10] Prior to discovery, Agent Braswell's sovereign immunity argument was rejected "[i]nasmuch as this Court cannot conclude at this stage of the proceedings that said Defendant's conduct occurred within the scope of her employment." (ECF No. 20 n. 1.) Now, with a developed record, the argument is reasserted and considered anew, and there can be no genuine dispute that Agent Braswell is entitled to sovereign immunity.

Employees of the Commonwealth of Pennsylvania are entitled to sovereign immunity when acting within the scope of their employment. 1 Pa. C.S. § 2310. Scope of employment is determined by state law. *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d. Cir. 2000) ("It is

---

[8] *See supra* n.7.
[9] *See supra* n.7.
[10] 1 Pa. C.S. § 2310 (2021) is titled "Sovereign immunity reaffirmed; specific waiver." This statute expressly articulates that the "Commonwealth [of Pennsylvania], and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall Specifically waive the immunity." None of the exceptions to sovereign immunity alluded to in 1 Pa. C.S. § 2310 are applicable to this suit. *See* 42 Pa. C.S. §§ 8521–22 (2021).

undisputed that whether [the defendants] did or not [act within the scope of their employment] is a matter of Pennsylvania state law."). Pennsylvania utilizes the Restatement (Second) of Agency to determine scope of employment. *Id.* It states that an employee's conduct is within the scope of employment when: 1) it is the kind she is employed to perform; 2) it occurs substantially within the authorized time and space limits; 3) it is actuated, at least in part, by a purpose to serve the master, and 4) if force is intentionally used by the employee against another, the force is not unexpectable by the employer. Restatement (Second) of Agency § 228.

Parole agents are "peace officers" under Pennsylvania law and have "police power and authority throughout the Commonwealth to arrest without warrant, writ, rule 12 or process any parolee or probationer under the supervision of the Board for failing to report as required by the terms of his probation or parole or for any other violation of the probation or parole." 61 Pa. C.S. § 6152. Defendant Braswell was employed as a Parole Agent for the Pennsylvania Board of Probation and Parole in December of 2014. (Braswell decl. ¶ 1.) Agent Braswell's arrest of the Plaintiff was in service to the Pennsylvania Board of Probation and Parole—she was working at CEC Oxford on December 16, 2014. (SUF ¶ 20; Braswell decl. ¶ 15.) Further, use of force in effectuating an arrest is expected. Therefore, Agent Braswell's conduct falls squarely within the scope of her employment as defined in the Restatement (Second) of Agency § 228. Accordingly, Agent Braswell is entitled to sovereign immunity for the Plaintiff's Second and Third Causes of Action.

## V.     Conclusion

For the reasons set forth herein, Defendant Chanelle Braswell's Motion for Summary Judgment is granted in its entirety.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II J